# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ORLANDO JONES,

    *Plaintiff*,

 v.

UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS,

    *Defendant*.

Civil Action No. 15-1384 (TJK)

## MEMORANDUM OPINION

Plaintiff Orlando Jones alleges that his former employer, Defendant Department of Veterans Affairs, discriminated against him in a variety of ways based on his race, gender, age, national origin, and disability, and then retaliated against him. Defendant has moved to dismiss Jones's disability discrimination claims and for summary judgment on all others. Defendant argues that it took no materially adverse action against Jones and, moreover, that a reasonable jury could not infer that it subjected him to discrimination or retaliation. For the reasons explained below, the Court agrees with Defendant. It will therefore grant its motion and enter summary judgment in its favor.[1]

---

[1] In reaching its conclusion, the Court considered all relevant filings including, but not limited to, the following: Plaintiff's Complaint, ECF No. 1 ("Compl."); Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 26; Defendant's Memorandum in Support of its Motion, ECF No. 26 at 24–47 ("Mot."); Defendant's Statement of Material Facts, ECF No. 26 at 5–23 ("Def.'s SMF"); Plaintiff's Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 28; Plaintiff's Memorandum in Support of his Opposition, ECF No. 28-1 at 25–47 ("Opp'n"); Plaintiff's Statement of Material Facts, ECF No. 28-1 at 1–25 ("Pl.'s SMF"); Defendant's Reply in Support of Its Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 29 ("Reply").

# I.    Background

## A.    Factual Background

Jones, an African-American male, was a GS-14 Lead Program Specialist at the Department of Veterans Affairs Learning University (VALU), where he worked in the Office of Policy and Resource Management.  Def.'s SMF ¶ 1.  He is also a service-disabled veteran who suffers from hypertension, anxiety, memory loss, and other ailments as a result of his disability.  Pl.'s SMF ¶ 1.  Jones's claims of discrimination and retaliation stem from a series of events at his workplace described below.

### 1.    Alice Muellerweiss's Farewell Ceremony Comments

In May 2012, Anita Wood, the Director of VALU's Office of Policy and Resource Management and Jones's direct supervisor, left the Department.  Def.'s SMF ¶ 2.  At a farewell ceremony for her that month, Jones and others spoke in front of approximately 70 other VALU staff.  Pl.'s SMF ¶ 14.  Alice Muellerweiss, who is Caucasian and served as Jones's second-line supervisor, gave a presentation at the ceremony before Jones's remarks.  *Id.* ¶ 8; Def.'s SMF ¶ 20.  Jones recalls that, after he stood up to make his remarks, Muellerweiss said "Oh, dag, here comes Orlando.  I might as well take me a seat, he's going to be forever."  Pl.'s SMF ¶ 14.  According to Jones, the other employees in attendance laughed at Muellerweiss's remark.  *Id.*  When asked about the ceremony, Muellerweiss did not recall making any comment towards Jones.  Mot., Ex. 3 at 23:11–18.  Other employees, however, recalled Muellerweiss addressing Jones, although they could not identify precisely what was said.  *Id.*, Ex. 1 at 23:12–15, Ex. 6 at 33:6–16, Ex. 8 at 57:13–17.  Wood recalled feeling "uncomfortable" at the ceremony and was "taken back by" Muellerweiss's comment.  *Id.*, Ex. 1 at 23:12–15.

## 2.    Meeting with Dr. Reginald Vance

After Wood's departure, Dr. Reginald Vance, who is African-American, became Acting Director of the Office of Policy and Resource Management.  Def.'s SMF ¶ 26.  In that capacity, Vance met with each member of the office one-on-one to "get a sense of the work that was being performed and how [he] could assist them with getting their work done."  *Id.*, Ex. 5 at 11:3–11. Prior to his meeting, Jones claims that he prepared a portfolio of all the work that he had completed for the year to discuss with Vance.  Pl.'s SMF ¶ 17.  When he arrived for his meeting on May 8, 2012, Jones asserts that he was forced to wait for ten minutes while Vance was on the phone.  *Id.*  And once Vance got off, he told Jones, referring to the portfolio, "what did you give me this here for," and "what would make you think I'd care."  *Id.* (quoting Opp'n, Ex. 2 at 24:12–21; 25:6–11).  Jones recalls that he responded by stating that, as a mentor, he thought Vance would care about his work and that he did not want to have any issues with him.  *Id.* According to Jones, Vance then stood up, pointed a finger in Jones's face, and yelled "let me tell you one goddamn thing."  *Id.*  At that point, Jones asked that the meeting be rescheduled.  *Id.*

Following the meeting, Jones reported Vance's behavior to "a number of individuals," including VALU's human resources director and Arthur McMahan, an African-American male serving as the Deputy Dean for VALU.  *Id.* ¶ 18; Def.'s SMF. ¶ 29.  Jones did not receive any follow-up from his reports of the incident.  Pl.'s SMF ¶ 20.

Vance, for his part, recalls the meeting differently.  In an email sent to his own supervisors summarizing the meeting, Vance reported that Jones had been "very hostile" and had attempted to "spur confrontation."  Def.'s SMF ¶ 28.  Later, however, Vance conceded that Jones "showed no outward signs of hostility" afterwards.  *Id.*

Subsequently, around June 2012, Jones recalls that he learned through a secondhand source that McMahan had referred to him as a "smart ass" and "a know it all," and remarked that

he did not like Jones.  Pl.'s SMF ¶ 19.  Jones did not discuss these remarks with McMahan or any other manager at VALU.  Def.'s SMF ¶ 31.  McMahan denied making any such comments. *Id.* ¶ 32.

### 3.      Jones's Team's Reorganization

In 2012, VALU underwent a reorganization because certain individuals under investigation for improprieties "could no longer perform their jobs." Def.'s SMF ¶ 33.  Twenty-five VALU employees were moved in the reorganization.  Defendant asserts that only one member of Jones's team was reassigned elsewhere, Def.'s SMF ¶ 34, while Jones says it was "several" of them, Pl.'s SMF ¶ 21–22.  In any event, Jones asserts that as a result of these reassignments—which happened between May and July 24—his team was understaffed, which left him to complete "a massive redrafting of core VA policies" on his own.  *Id.* ¶ 22.  At the time, Jones was not told why the reorganization took place.  *Id.* ¶ 23.

### 4.      Christopher Burroughs's Appointment as Director

Following Wood's departure from VALU, Jones and others applied for the vacant position of Director of the Office of Policy and Resource Management.  *Id.* ¶ 25.  Christopher Burroughs, an African-American female, was appointed to the position in late July 2012.  *Id.* at 26.  According to Jones, Burroughs told him that VALU had preselected her for the position.  *Id.* Although Jones asserts that he was more qualified for the position, he did not receive an interview and was ranked last among the 40 applicants.  *Id.* In contrast, Jones heard from others that McMahan and Vance lobbied in support of Burroughs.  *Id.* After learning about the appointment process, Jones filed a complaint with the Department's Inspector General alleging that the "selection process had been compromised."  Pl.'s SMF ¶ 26; *see* Opp'n, Ex. 13 at 3.

When interviewed about Jones's allegations, Muellerweiss noted that of the approximately 40 candidates for the position of Director, only the six top-scoring candidates

received interviews. Opp'n, Ex. 15 at 7. She further stated that neither McMahan nor Vance had any influence on the ranking and that Jones's race, gender, national origin, age, or prior filings with the Equal Employment Opportunity (EEO) office had no effect on his position as the lowest-ranked candidate. *Id.*

### 5. Zelda Davis's Three-Day Term as Acting Director

In early August 2012, Burroughs, following her appointment as Director, informed her staff that the VALU leadership team would be working at an offsite facility for three days. Def.'s SMF ¶ 36. Burroughs appointed Zelda Davis, an African-American female serving as a GS-13 human resources manager, to be Acting Director in her absence. Pl.'s SMF ¶ 29. At the time, Jones, as a GS-14 employee, was higher-ranked. *Id.* Jones later asked Burroughs why Davis was appointed instead of him. *Id.* ¶ 30. He recalls that she "acknowledged that lower grade employees [were] not to be placed over higher ones" but that she had received approval from the legal department to do so. *Id.* According to Burroughs, she appointed Davis because of her knowledge of the office's workload over the relevant three-day period. Def.'s SMF ¶ 37.

On the first day that Davis was Acting Director, Jones left the building because of an episode of disability-related incontinence. Pl.'s SMF ¶ 31. Jones recalls that he was out of the office for approximately 35 minutes. *Id.* When he returned, he had received an email from Davis asking where he had been. *Id.* He replied stating, "I'm here, where are you?" *Id.* According to Jones, Davis then went to his office and "loudly demanded that he meet with her immediately in the conference room." Pl.'s SMF ¶ 32. Once there, she pointed her finger in his face and yelled "Where in the hell were you? What are you trying to pull? What is this all about? I didn't like your email." *Id.* Jones recalls that he told her to stop yelling and that she was invading his personal space. *Id.* In response, Jones recounted, Davis moved closer to him and said, "What are you going to do?" *Id.* At that point, Jones tried to leave the conference

5

room.  *Id.*  As he left, Davis followed him out and continued to yell at him within earshot of other employees in the office.  *Id.*

That same day, Jones reported what had happened to another director at VALU.  Pl.'s SMF ¶ 34.  He asserts that he was not asked to provide a statement and was not interviewed about the dispute, although Burroughs solicited statements from other staff about it.  *Id.*; Opp'n, Ex. 8 at 47:14–15.

Davis recalls the event differently.  According to her, Jones had been away from the office "for hours" that morning.  Def.'s SMF ¶ 38.  She looked for Jones throughout the office building but did not find him.  *Id.*  When Davis returned from a break in the afternoon to find Jones in his office, she requested that he join her in the conference room.  *Id.* ¶¶ 38–39.  After asking where he had been, she recalls that Jones began to yell at her.  *Id.* ¶ 39.  According to Davis, Jones then opened the conference room door and told her loudly to stop yelling at him.  *Id.* ¶ 40.  When Davis replied that she had not raised her voice, he moved closer to her and again warned her to stop yelling at him.  *Id.*  Davis asked Jones whether he intended to hit her and called out to other employees that Jones was "trying to make a scene."  *Id.*

Davis says she reported Jones's behavior to Burroughs via email, copying Vance and McMahan.  *Id.* ¶ 41.  Davis also asserts that she emailed the office staff and apologized to anyone who witnessed the incident.  *Id.* ¶ 42.  She requested that any witnesses to the event "write a statement about what [they] observed" between her and Jones.  *Id.* (quoting Mot., Ex. 26 at 2).  At least two employees wrote emails to Davis describing their observations.  *Id.* ¶ 42.  One employee recalled that Jones was not at his desk that day from at least 11:00 a.m. until sometime after 1:00 p.m.  Mot., Ex. 27.  That employee also heard raised voices in the conference room and wrote that Jones stepped out of the room to ask whether other staff heard Davis instruct him

not to raise his voice at her. *Id.* A second employee wrote that the incident "happened out of the blue" and that Davis had asked Jones to let her or others know when he was going to be away from his desk for a significant time. Def.'s SMF ¶ 42; Mot., Ex. 28.

According to Burroughs, when she returned to the office, Jones "stomped around her office," Def.'s SMF ¶ 43—a fact that Jones denies, Pl.'s SMF ¶ 33—while expressing his disagreement with her decision to appoint Davis as Acting Director, Def.'s SMF ¶ 43. Burroughs recalls Jones telling her that she did not have the authority to appoint anyone to be his supervisor, especially someone of a lower level. *Id.* Burroughs claims he directed Davis to provide a statement and collected statements from other witnesses as well. *Id.* ¶ 44.

### 6.    Compensatory Time for Conference Work

In August 2012, Jones volunteered to help coordinate a conference in Phoenix, Arizona, shortly before it was scheduled to begin. Pl.'s SMF ¶ 36. Given the urgency of the task, Jones asserts that Burroughs verbally approved his request to receive compensatory time for his work there. Opp'n, Ex. 2 at 35:22–36:3. While at the conference, Jones worked overtime. Pl.'s SMF ¶ 37. When he returned, Jones submitted his recorded compensatory time to Burroughs for processing. Opp'n, Ex. 18. Approximately three weeks later, Jones learned that he did not receive compensatory time when it did not appear in his paycheck. Pl.'s SMF ¶ 38.

Burroughs asserts that she did not initially approve Jones's compensatory time because Jones had been working a compressed schedule and thus had not worked the required 80 hours in the previous pay period. Def.'s SMF ¶ 55. But later, when the issues regarding Jones's schedule were "straightened out," Jones received the compensatory time that he requested. *Id.* ¶ 56.

### 7.    Sick Leave Disputes

Due to his service-related medical conditions, Jones often took sick leave on short notice. Pl.'s SMF ¶ 45. According to Jones, if Department employees need to take sick leave for more

than three days, they may take it without giving notice as long as they notify their supervisor at the earliest opportunity and, upon their return, record the leave electronically. *Id.* Additionally, Jones asserts that sick leave requests for treatments related to a service-connected disability "cannot be denied, regardless of whether any sick leave is available." *Id.* ¶ 47. Jones asserts that he regularly followed the Department's sick leave procedures. *Id.* ¶ 46.

When Burroughs became Director, however, Jones asserts that she "consistently denied" his sick leave. *Id.* The record contains only one example of such a denial, *see* Mot., Ex. 30; Opp'n, Ex. 25, in addition to an instance in November 2012, discussed separately below, in which Jones asserts he was forced to return to work to request sick leave. On September 20, 2012, Burroughs emailed Jones to inform him that she was unable to approve all the sick leave he had recently requested because his balance for sick leave was too low. Mot., Ex. 30. Instead of using sick leave, she requested that he "change the type of leave for approval." *Id.* On September 24, Jones wrote back, disagreeing with Burroughs's claim that he had run out of sick leave. He included in his email a balance statement indicating that he still had approximately 81 hours of leave time available. *Id.* In response, Burroughs informed him his previous leave requests had not yet been processed so his then-current balance was insufficient to cover his request. *Id.* The following day, a program specialist replied in the same email chain to note that the balance he cited did not reflect 35 hours of leave he took in the previous pay period. *Id.* Jones replied stating "Bottom line is that I have hours, therefore my [sick leave] should not have been disapproved." *Id.*

Other portions of the record cited by the parties show disputes between Jones and Burroughs regarding whether Jones followed the proper procedures for requesting sick leave, Mot., Ex. 31, whether he was rude in making his requests, Opp'n, Ex. 25, and whether

Burroughs improperly copied Davis on emails containing Jones's personal medical information, Pl.'s SMF ¶ 51, but they do not point to any other examples of Burroughs denying Jones's leave, or that Jones accrued leave was improperly reduced in some way. And the parties agree that Jones took leave whenever he wanted. Burroughs asserts that Jones never failed to take sick leave he requested, even when she did not approve it. Def.'s SMF ¶¶ 61–62. For his part, Jones does not contest that he "always took his leave." Pl.'s SMF ¶ 48.

### 8. Burroughs's Written Reprimand of Jones

On October 22, 2012, Jones received a formal letter of reprimand from Burroughs concerning his August dispute with Davis in the conference room, as well as his "disrespectful" emails to Burroughs and other staff members. *See* Mot., Ex. 32. In the letter, Burroughs concluded that Jones's "inappropriate and unprofessional" behavior had "caused a hostile work environment within the office." *Id.* According to Jones, the letter was the first reprimand he had ever received as a federal employee. Pl.'s SMF ¶ 58. He explained to Burroughs why he believed the reprimand to be unwarranted, noting that Davis was equally at fault over the first incident and that his emails contained no inappropriate cursing or derogatory language. *Id.* ¶¶ 60–62. In response, Jones recalls that she told him: "oh well." *Id.* ¶ 62.

### 9. Burroughs's Criticism of Jones's Performance and Jones's Performance Evaluation

On September 4, 2012, Jones says he sent Burroughs a letter expressing his concerns about her treatment of him compared to other employees. Pl.'s SMF ¶ 40. In response, Burroughs requested a meeting with Jones. *Id.* At the meeting, according to Jones, Burroughs told him that he had changed and that he needed to focus on his job. *Id.* Jones was surprised by her criticism, since he had recently received a certificate of appreciation from the Chief of Staff of the Department, as well as other commendations. *Id.* ¶ 41. He informed two supervisors of

what happened at the meeting and provided them a copy of his letter. *Id.* ¶ 44. Neither supervisor responded. *Id.*

According to Burroughs, the meeting in question concerned Jones's upcoming performance evaluation for the period running from October 2011 to September 2012. Def.'s SMF ¶¶ 57–59. At the time Wood departed as the Division Director in May 2012, she provided a summary review of Jones's performance to up to April 2012, rating Jones as "outstanding." Opp'n, Ex. 8 at 62:20–23. In the review, she also noted "three items he was required to achieve by the end of the performance period." Def.'s SMF ¶ 58. According to Burroughs, Jones had not yet completed these items by early September, even though the deadline was the end of that month. *Id.* ¶ 60. On September 4, Burroughs recalls that she asked Jones to come to her office, where she told him that "he was in jeopardy of getting an . . . unsatisfactory performance rating because these items needed to be done." Opp'n, Ex. 8 at 64:22–25.

When the review period ended on September 30, Burroughs asserts that Jones still had not completed the assignments. Def.'s SMF ¶ 60. According to Jones, he was on track to complete the assignments, but the reassignment of the members of his team that had been working on them made the task more difficult. Pl.'s SMF ¶ 56. Regardless, Jones asserts that he completed the assignments on time and sent them to his supervisors for review. *Id.* He also contends that he submitted work product for one of them to Burroughs in early September, but he never received feedback. *Id.* ¶ 57.

In January 2013, Burroughs issued Jones a final performance review for the period from October 2011 to September 2012, in which she rated his performance as "satisfactory." Def.'s SMF ¶ 60. In the review, Burroughs noted the incomplete assignments and stated that she could "not identify evidence of [Jones's] leadership." Opp'n, Ex. 30 at 2. The review further stated

that there was "no indication that [Jones] utilized resources available to prepare . . . required work products that were assigned to him." *Id.* And it noted that although Jones had "been exceptionally diligent in support of a wide variety of efforts," such as "numerous committees," he did not adequately "address matters in line with assigned responsibilities." *Id.* Prior to this review, Jones had never received a performance review rating of less than "outstanding or excellent." Pl.'s SMF ¶ 54.

### 10. Administrative Leave Dispute

Jones filed an EEO claim after Mullerweiss's comments at the farewell ceremony in May 2012, and a second one after the meeting with Burroughs in September 2012. Pl.'s SMF ¶¶ 27,63. In connection with these claims, he had several meetings with the Department's General Counsel and VALU's Acting Dean, Cathy Biggs-Silvers. *Id.* ¶ 65. As a result of their discussions, Jones ended up taking leave for most of November—although the parties disagree over how that came about. *See id.* ¶¶ 65–68; Def.'s SMF ¶¶ 63–65.

In late November 2012, the parties agreed that Jones could take administrative leave from November 7th through 9th. Pl.'s SMF ¶ 65. Jones was hoping that upon his return to work, he would be temporarily reassigned until his complaints were investigated. *Id.*; *see* Opp'n, Ex. 2 at 61:19–62:9. He contends that he was informed that if the decision over his reassignment was not made by the end of the following week—November 16, 2012—he would remain on administrative leave until approximately November 28, 2012. Pl.'s SMF ¶ 65. According to Jones, Biggs-Silvers approved of this arrangement in a November 8, 2012 email. *Id.*; *see* Opp'n, Ex. 47.

In that email, however, Biggs-Silvers only approved Jones's requested leave from November 7th through 9th, noting that Jones "still must follow office procedures for requesting leave to ensure it is correctly documented." *Id.*, Ex. 47. Jones replied two days later confirming

that he was on leave during those dates, that he was "following instructions" to take authorized absences on November 13th and 14th, and that he was electing to take "the Annual Leave option" for seven workdays between November 15th and 28th. *Id.*

Burroughs replied to Jones by noting that he had been "advised to request annual leave from [his] supervisor for any dates after November 14," and that, as his supervisor, she was "not inclined to approve" his requested leave after that date because his team "has been and continues to be substantially behind on a number of critical policy and process actions." *Id.* In response, Jones informed her that Biggs-Silvers had approved his leave for those dates and that Burroughs's "continued systematic harassment" had caused his medical problems to worsen. *Id.* Jones added that "until my environment change[s] or I complete the proper medical treatment to help me cope with working under such . . . hostility," he would not return to the office. *Id.* Jones then asked Biggs-Silvers for clarification. Pl.'s SMF ¶ 67. She informed Jones that he was still required to obtain approval of the requested leave from Burroughs. *Id.* Jones asserts that, at that time, her explanation did not make sense to him. *Id.*

Subsequently, in January 2013, Jones asserts that he was suspended for five days. *Id.* ¶ 68. One of the major reasons for the suspension, he contends, was that he did not obtain prior approval from Burroughs before taking leave in November 2012. *Id.*

### 11. Sick Leave Request in November 2012

In the early morning of November 29, 2012, Jones sent an email to Biggs-Silver and Burroughs informing them that he would not be in the office that day because he was not feeling well and he had a scheduled medical appointment. *Id.* ¶ 69. Burroughs responded to the email by noting that Jones "did not request this leave in accordance with VALU policy" and that he was "not on approved leave." Opp'n, Ex. 48. Jones replied stating that he did follow the correct procedures, that Burroughs continued to "insult [his] intelligence," and that he was "going to

walk out of the doctor's office and make my way there to the office." *Id.* He also stated that Burroughs was "now liable for anything that happens." *Id.* According to Jones, Burroughs had "demanded that he come to the office" which was approximately 27 miles from the medical facility where his appointment was taking place. Pl.'s SMF ¶ 70. Jones feared that he would lose his job if he did not return to enter his time. *Id.* But according to Burroughs, she did not request that Jones return to the office and instead informed him that he could send an email regarding his leave status. Def.'s SMF ¶ 64. When Jones returned to the office, Burroughs recalled that he looked "disheveled" and was "foaming at the corners of his mouth." *Id.* ¶ 65. Biggs-Silvers asked Jones why he had not requested leave from Burroughs and suggested that he enter his leave request at that time since he was at the office. *Id.*

### 12. Transfer and Retirement

Following Jones's filing of his second formal EEO complaint in February 2013, the Department agreed to temporarily transfer Jones to another directorate within the agency. Opp'n, Ex. 1 ¶ 24. In April 2013, he was permanently transferred to the National Cemetery Administration. *Id.* Following his transfer, he asserts that Burroughs contacted his supervisor and reported his prior EEO activity, and that, afterward, his new supervisor was hostile to him in unspecified ways. *Id.* In April 2015, Jones applied for and was granted Medical Retirement Disability status. *Id.*

### B. Administrative and Procedural History

On July 25, 2012, Jones contacted the Department's EEO office and filed a claim regarding perceived discriminatory treatment. Pl.'s SMF ¶ 27. In his conversation with the counselor, Jones alleged that he was being subjected to a hostile work environment due to his gender, national origin, age, and race. Mot., Ex. 11 at 51. He also alleged that he faced retaliation for engaging in protected activity. *Id.* His claim focused in part on Muellerweiss's

comments at the farewell ceremony. *See* Opp'n, Ex. 15 at 2. Jones filed a formal EEO complaint on September 15, 2012, in which he alleged that he was subject to discrimination and harassment based on his race, gender, age, and national origin, and retaliation for engaging in protected activity. Mot., Ex. 12 at 130–36. The EEO office notified Jones that it had accepted his complaint on October 1, 2012. Mot., Ex. 13 at 197–199.

Following his meeting with Burroughs on September 4, 2012, Jones filed a second EEO claim focusing on separate alleged incidents of discrimination. Pl.'s SMF ¶ 63. In that claim, initially filed on or around September 27, 2012, Jones alleged that he was subject to a hostile work environment based on his gender, race, age, and disability. *Id.* ¶ 64. In addition, he alleged that he was subject to retaliation for engaging in protected activity. *Id.* He filed a formal complaint in that case on January 7, 2013. *Id.*, Ex. 15 at 141–42. The EEO office notified Jones that it had accepted his complaint on February 15, 2013. *Id.*, Ex. 46. It then consolidated Jones's two complaints into one around April 2013 and summarized his claims as follows:

> Whether complainant was subjected to a hostile work environment based on age, race (Black), sex (male), and reprisal (prior EEO activity) as evidenced by the following events:
>
> ● On May 4, 2012, Alice Muellerweiss (AM), Dean of VA Learning University (VALU), "poked fun" at the complainant and spoke about him in a "condescending manner" during an employee's farewell ceremony.
>
> ● On May 4, 2012, July 23, 2012, and July 24, 2012, the complainant became aware that management officials removed "key members" of his team and reassigned them, without involving him in the decision.
>
> ● On May 7, 2012, Dr. Reginald Vance (Dr. RV), Acting Supervisory Management Analyst, yelled at and pointed his finger in the complainant's face.
>
> ● On June 16, 2012, the complainant was informed by a peer that Dr. Arthur McMahan (Dr. A. McM), Deputy Dean, called the complainant a 'smart ass' and 'a know it all,' and stated that he did not like him.

- On August 2, 2012, Zelda Davis, Supervisor, approached the complainant in an intimidating and hostile manner, wherein she pointed her finger in his face and used expletives.

- On August 30, 2012, and September 24, 2012, Ms. Chris Burroughs, Director, Policy Plans and Resources, failed to approve and grant the complainant's compensatory (comp) time earned during the period of August 24-August 29, 2012.

- On September 4, 2012, Ms. Burroughs displayed an intimidating manner towards the complainant when she criticized his work efforts, issued complainant a "letter of concern."

- On September 21, 2012, Ms. Burroughs investigated an incident that occurred on September 2, 2012, that was allegedly biased and portrayed the complainant in an unfavorable manner.

- During the period of June 1, 2012, through September 25, 2012, Ms. Burroughs denied approval of sick leave requested by the complainant.

- During the weeks of September 24, 2012, and September 27, 2012, ongoing, Ms. Burroughs carbon copied (cc's) e-mail correspondence (that contained privileged information and personal communications) to Ms. Zelda Davis.

- On October 22, 2012, Ms. Burroughs issued the complainant a letter of reprimand for inappropriate conduct on August 2, 2012, and September 27, 2012.

- On November 26, 2012, Ms. Burroughs issued the complainant written notice, regarding his failure to properly request leave in advance from his supervisor.

- On November 29, 2012, complainant reported Ms. Burroughs required him to return to the facility to enter his leave request into IFCAP, and as a result, he incurred an excessive trip of sixty-four miles to do so.

*Id.*, Ex. 17.

Following the consolidation of his complaints, the EEO investigated Jones's allegations. *See id.*, Ex. 18. Jones requested a hearing from an EEOC administrative judge in March 2014, *id.*, Ex.19, and then voluntarily dismissed his case in May 2015, *id.*, Ex. 20. Jones filed this action in August 2015 and the case was assigned to the undersigned in September 2017. After the close of discovery, Defendant moved to dismiss Jones's claims under the Americans with

Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*, and for summary judgment on all remaining claims. *See* Mot. Jones filed an opposition to that motion, *see* Opp'n, and Defendant filed a reply in support of its motion, *see* Reply.

## II. Legal Standards

Federal Rule of Civil Procedure 12(b)(1) requires federal courts to dismiss claims that lie outside their limited jurisdiction. Because federal law presumes that a cause lies outside this limited jurisdiction, a plaintiff bears the burden of establishing that a court has jurisdiction over her claim. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). In considering a Rule 12(b)(1) motion, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotations omitted). Nevertheless, a court may look beyond the allegations of the complaint and "undertake an independent investigation" of the "facts developed in the record" to assure itself of its own subject-matter jurisdiction. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005).

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriately granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute of material fact is one that "might affect the outcome of the suit under the governing law" and where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering whether a genuine issue of material fact exists, the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *See Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In response, the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017).  In doing so, the non-movant cannot rely on "mere allegations," *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006), and must do more than "show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  And on claims where the non-movant bears the burden of proof at trial, she must make an evidentiary showing "sufficient to establish the existence of [each] essential element to [her] case." *Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and therefore entitles the moving party to "judgment as a matter of law." *Id.* at 323.

## III.  Analysis

Defendant is entitled to dismissal or summary judgment with respect to each count in Jones's complaint.  Counts III and VI, which set forth claims for disability discrimination and related retaliation, must be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1) because Jones failed to exhaust them.  Defendant is entitled to summary judgment on Counts II and V, which assert claims for age discrimination and related retaliation, because Jones has abandoned them.  And for a variety of reasons explained below, Defendant is entitled to summary judgment on Counts I and IV, which assert claims for discrimination based on race and gender and related retaliation.

## A.    Disability Discrimination and Retaliation (Counts III and VI)

The Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, prohibits federal employees from engaging in discrimination prohibited by the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101 *et seq.*, including denying employment opportunities to an "employee who is an otherwise qualified individual with a disability," 42 U.S.C. § 12112(b)(5)(B).[2]  The Act also prevents employers from retaliating against employees who complain about discrimination prohibited by the ADA.  29 U.S.C. § 791(f); *see Solomon v. Vilsack*, 628 F.3d 555, 559–60 (D.C. Cir. 2010).  Federal employees are required to exhaust their administrative remedies before filing suit under the Rehabilitation Act.  *See Payne v. Salazar*, 619 F.3d 56, 58 (D.C. Cir. 2010).

In order to exhaust such a claim, "the employee generally must contact an EEO counselor to complain about the alleged violation within 45 days of its occurrence," *Koch v. Walter*, 935 F. Supp. 2d 164, 170 (D.D.C. 2013), and then provide the employer notice of the allegation by filing a formal EEO complaint, *see Coleman v. Duke*, 867 F.3d 204, 210–13 (D.C. Cir. 2017).  A district court may review only claims that are "like or reasonably related to the allegations" contained in the EEO complaint.  *Koch*, 935 F. Supp. 2d at 170.  "While 'every detail of the eventual complaint need not be presaged in the [EEO complaint],' the substance of the plaintiff's Rehabilitation Act claim 'must fall within the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Latson v. Holder*, 82 F. Supp. 3d 377, 385 (D.D.C. 2015) (quoting *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997)).  Jones "has the burden to plead and prove" that he properly exhausted his Rehabilitation Act claims.  *Rosier v. Holder*, 833 F. Supp. 2d 1, 8 (D.D.C. 2011).

---

[2] Although Jones invokes the Americans with Disabilities Act as the authority for his disability claim, the Rehabilitation Act provides the exclusive remedy for federal employees bringing claims against their employer for disability discrimination.  *See Ahmed v. Napolitano*, 825 F. Supp. 2d 112, 115 (D.D.C. 2011).

A plaintiff's failure to file a formal EEO complaint about claimed discrimination is a *jurisdictional* defect, requiring a dismissal of his suit for lack of subject-matter jurisdiction. *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006). *Cf. Doak v. Johnson*, 798 F.3d 1096, 1104 (D.C. Cir. 2015) (finding that a plaintiff's failure to comply with administrative time limits is not jurisdictional). And a plaintiff's failure to include disability discrimination or retaliation claims in an EEO complaint is equivalent to the "wholesale failure" to file a complaint on those claims. *See McIver v. Mattis*, 318 F. Supp. 3d 245, 251 (D.D.C. 2018).

Defendant contends that because the formal EEO complaints filed by Jones in September 2012 and January 2013 fail to allege that he suffered from disability discrimination or retaliation, the Court has no jurisdiction to hear his Rehabilitation Act claims. Mot. at 8. In response, Jones points to his initial claim filed with the EEO on September 27, 2012, which identified his disability as a basis for his harassment and hostile work environment claim. Opp'n at 44; *see id.*, Ex. 44. In addition, Jones argues that because the facts underlying his various claims overlap, the Department was sufficiently on notice of his discrimination and retaliation allegations related to his disability. Opp'n at 44.

The Court finds that Jones's disability claims have not been exhausted and that, as a result, they must be dismissed for lack of subject-matter jurisdiction. Neither of Jones's two formal EEO complaints, filed in September 2012 and January 2013, allege that he experienced disability discrimination or retaliation based on complaints of disability discrimination. *See* Mot., Ex. 12, Ex. 15. As a result, neither led to a "final disposition" on such claims, to which this Court's review is limited. *Spinelli*, 446 F.3d at 162 (citing 29 U.S.C. § 794a(a)(1)). And although one of Jones's initial EEO claims listed "disability" as a basis for his allegation of discrimination, that informal filing is insufficient to exhaust his claims. *See Hamilton v.*

*Geithner*, 666 F.3d 1344, 1350 (D.C. Cir. 2012) ("Filing a formal complaint is a prerequisite to exhaustion . . . , so [the plaintiff] cannot rely on the EEO counseling report to establish exhaustion of a claim that he failed to include in his formal complaint.").  Moreover, Jones's exhausted allegations of *other* types of discrimination are insufficient to exhaust his disability claims, even if they are grounded in the same or similar facts.  *See, e.g.*, *Demissie v. Starbucks Corp. Office and Headquarters*, 19 F. Supp. 3d 321, 324 (D.D.C. 2014) (holding that an administrative complaint alleging national-origin discrimination failed to exhaust discrimination claims based on race and gender); *Bowe-Connor v. Shinseki*, 923 F. Supp. 2d 1, 6–7 (D.D.C. 2013) (holding that an administrative complaint alleging age and gender discrimination failed to exhaust discrimination claims based on national origin).  For all these reasons, the Court must dismiss Jones's claims of discrimination based on his disability for lack of subject-matter jurisdiction under Rule 12(b)(1).

### B.       Age Discrimination and Retaliation (Counts II and V)

In these counts, Jones alleged discrimination and retaliation under the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 *et seq.*  *See* Compl. ¶¶ 68–77, 95–101.  In moving for summary judgment, however, Defendant informed the Court that Jones withdrew all his claims under the ADEA.  Mot. at 2 n.3.  Jones has neither disagreed nor argued that he was subject to discrimination or retaliation under the ADEA in his opposition brief.  The Court thus considers Counts II and V abandoned and will grant summary judgment for Defendant on them.

### C.       Race and Gender Discrimination (Count I)

Title VII of the Civil Rights Act requires that employment decisions by the federal government be "made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  To establish a discrimination claim under Title VII, a

plaintiff must have "suffered an adverse employment action because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

An adverse employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Douglas v. Donovan*, 559 F.3d 549, 557 (D.C. Cir. 2009). In considering whether an employee suffered an adverse action, courts look to whether the employee experienced "consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). "Further, '[a] tangible employment action in most cases inflicts *direct* economic harm.'" *Douglas*, 559 F.3d at 552 (alteration in original) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998)). And while adverse employment actions may "extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001). "For employment actions that do not obviously result in a significant change in employment status . . . [,] an employee must go the further step of demonstrating how the decision nonetheless caused an objectively tangible harm." *Douglas*, 559 F.3d at 553. This threshold requirement serves to guard against courts being weighed down with "frivolous suits over insignificant slights." *Russell*, 257 F.3d at 818.

Once a plaintiff shows she suffered an adverse employment action, she may demonstrate unlawful discrimination through direct or indirect evidence. Direct evidence may include, for example, an employer's overt reference to the employee's protected trait when making an

unfavorable employment decision. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013). Courts analyze indirect evidence of discrimination under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the employee must first establish a prima facie case of discrimination in violation of Title VII. *McDonnell Douglas*, 411 U.S. at 802. If the employee succeeds in doing so, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016). And if the employer provides such a reason, the burden shifts back to the employee "to show that the employer's stated reason for its actions was in fact pretext for unlawful discrimination." *Id.*

The D.C. Circuit has instructed that "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—and *should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, the Court should focus on "one central question: [whether] the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Id.*

As described in detail above, Jones asserts that his coworkers and supervisors discriminated against him on account of his race and gender in various ways.[3] These actions, as Jones categorizes them, include (1) his supervisors' and coworkers' derogatory comments and other hostile behavior; (2) his team members' reorganization without his approval, (3)

---

[3] Like his ADEA claims, Defendant asserts that Jones withdrew his Title VII claim for discrimination based on national origin, which Jones does not contest. Mot. at 2 n.3. The Court thus considers that claim abandoned as well.

Burroughs's hiring as Director over him, (4) Davis's appointment as Acting Director over him, (5) his supervisors' rejection of his requests for leave, and (6) his formal reprimand, average performance evaluation, and five-day suspension.  Although Defendant strongly contests Jones's accounts of certain incidents, the Court must view all evidence in the light most favorable to Jones and draw all reasonable inferences in his favor.  *Morris v. McCarthy*, 825 F.3d 658, 667 (D.C. Cir. 2016).  Nonetheless, for the reasons explained below, Defendant is entitled to summary judgment.

### 1. Discrete Acts of Discrimination

#### a. Derogatory Comments and Other Hostile Behavior

Jones alleges that various supervisors and coworkers—including Muellerweiss, Vance, McMahan, Burroughs, and Davis—made derogatory remarks about him, belittled him, and criticized his work without justification on several occasions between May and September 2012.  Opp'n at 30–32.  The comments range from public teasing at a work event to remarks that he is "a know it all" and a "smart ass."  Pl.'s SMF ¶¶ 14, 19.  Jones also describes several contentious workplace disputes where, for example, his supervisor "berated him" by telling him that "he should just concentrate on his work and nothing else," and where another colleague belittled him by "yelling at him and pointing [a] finger in his face."  Opp'n at 32.

Individually or collectively, these comments and hostile interactions were not severe enough to qualify as adverse employment actions.  Title VII "does not set forth 'a general civility code for the American workplace.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Services, Inc.* 523 U.S. 75, 80 (1998)).  Generally, verbal comments by a supervisor, including "offensive and repugnant" comments such as racial or sexual slurs, do not independently constitute adverse employment actions.  *See Baloch*, 550 F.3d at 1199 (finding "outbursts" of "profanity-laden yelling" by a supervisor not to

qualify as adverse actions); *Slate v. Pub. Def. Serv. for the District of Columbia*, 31 F. Supp. 3d 277, 295–96 (D.D.C. 2014) (collecting cases). Likewise, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting in first part *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). Even considered in the light most favorable to Jones, this behavior by his supervisors and coworkers, while perhaps harsh or disproportionate, fails to meet the requisite level of severity. Jones therefore has no actionable Title VII claim based on this behavior.

### b.    Reorganization of Jones's Team

Jones contends that Defendant discriminated against him by reassigning and removing members of his team without explanation at a time when he was tasked with completing "massive assignments" with pending deadlines. Opp'n at 33–34. As a result, he contends that he "was not able to perform his job duties," which caused him to receive a negative performance evaluation in September 2012. *Id.* at 33.

The reassignment of Jones's team members does not qualify as an adverse employment action because he fails to provide any evidence that the reassignment "entail[ed] a loss of salary, grade level, or benefits," or caused Jones to have "'significantly different'—and diminished— supervisory and programmatic responsibilities." *Baloch*, 550 F.3d at 1196–97 (emphasis removed) (quoting *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007)). Jones was not a supervisor, so he had no formal supervisory duties. Def.'s SMF ¶ 35. And while Jones points to a description of his GS-14 Lead Program Specialist position that notes that such employees typically lead small teams by delegating work to other employees, Pl.'s SMF ¶ 24, a reassignment of several team members hardly meets the standard for an adverse employment action. Moreover, that Jones received a negative performance evaluation based in part on his

inability to complete his assigned tasks, *see* Pl.'s SMF ¶ 55, likewise does not constitute an adverse action, as explained below.

Even if the Court were to find that the reorganization was an adverse action, however, Jones fails to produce evidence that Defendant's legitimate, non-discriminatory reason for the reorganization was pretextual. Defendant explained that the reason for the reorganization was the havoc caused by an investigation into improprieties at VALU. And because Jones was not a supervisor, the managers overseeing the reorganization did not consult him regarding the transfers. Def.'s SMF ¶ 35. Based on the supporting evidence cited in the record, *see* Mot., Exs. 6, 10, the Court finds that Defendant has provided a legitimate, non-discriminatory explanation for the reorganization. *See Figueroa v. Pompeo*, 923 F.3d 1078, 1087–88 (D.C. Cir. 2019) (outlining the factors courts consider in assessing an employer's stated reason for an allegedly adverse action).

Under the *McDonnell Douglas* framework, Jones must present evidence to support a reasonable inference that Defendant's explanation is pretextual. He offers none, again merely pointing to his job description. *See* Opp'n, Ex. 11; Pl.'s SMF ¶ 24. But that description offers no basis for a reasonable jury to doubt Defendant's explanation. Jones also claims that Defendant has failed to identify other employees at his level who had team members removed or reassigned. Opp'n at 34. But that misses the point. Once, as here, a defendant has provided a legitimate, non-discriminatory reason for its action, the burden is on the plaintiff to show that a reasonable jury could find the reason a pretext for discrimination. Jones has not done that. The Court finds that a reasonable jury could not find that Defendant's stated reasons for the reorganization were a pretext for race or gender discrimination against Jones, and for that reason summary judgment is warranted for Defendant.

### c.  Burroughs's Hiring as Division Director Over Jones

Jones also argues that Defendant promoted Burroughs "in violation of fair hiring practices" because she was "pre-selected for the [Director] position" for which he had applied. Opp'n at 34.  He claims that Defendant discriminated against him by failing "to give him a fair and impartial opportunity to compete for a promotion."  *Id.*  However, Jones's complaint contains no allegations that Burroughs was improperly promoted or that Defendant discriminated against him by failing to fairly consider his candidacy for the position.  *See* Compl.  And he has not sought or received leave to amend his complaint.  "A party may not amend its complaint or broaden its claims through summary judgment briefing."  *Haynes v. Navy Fed. Credit Union*, 52 F. Supp. 3d 1, 8 (D.D.C. 2014); *see also Martin v. District of Columbia*, 78 F. Supp. 3d 279, 316 n.55 (D.D.C. 2015) (granting summary judgment on Title VII claims based on factual allegations not found in the pleadings).  Jones has not pled these allegations, and thus they cannot sustain Count I.

### d.  Davis's Appointment as Acting Director Over Jones

Next, Jones argues that Burroughs's decision to appoint Davis, then a GS-13 human resources manager, as Acting Director for three days in her absence constituted an adverse employment action.[4]  Opp'n at 36.  Because Burroughs failed to appoint Jones, then in a higher-ranked GS-14 position, she "diminished, diluted and removed [his] job responsibilities and duties, thereby jeopardizing his pay grade and ultimately his job."  Opp'n at 36.  But the decision to appoint Davis as Acting Director over *three days* while Burroughs attended an offsite event is

---

[4] As part of this argument, Jones also asserts that the investigation of his August 2, 2012 confrontation with Davis while she served as Acting Director was "one-sided" and "contrary to [Defendant's] practices."  Opp'n at 36.  Because the investigation ultimately led to Jones receiving a letter of reprimand, the Court considers this argument part of his allegation that the reprimand was discriminatory and retaliatory, addressed below.

not an action that "obviously cause[d] a significant change in employment status" to Jones. *Douglas*, 559 F.3d at 553. And Jones cites no evidence that Davis's temporary appointment had any sort of tangible and significant effect on his employment going forward. On the record here, this action cannot form the basis for Jones's discrimination claim.

### e. Denial of Sick Leave and Compensatory Time

Jones contends that Burroughs consistently and inappropriately denied his sick leave from June to November 2012. *See* Opp'n at 37–38. But the record reflects only one specific time when Jones did so. And on that occasion, Burroughs did not prevent him from taking leave but offered to let him use "annual leave or advance sick leave" instead. Mot., Ex. 30. Even assuming Burroughs denied Jones's requests on other occasions, Jones does not show that these denials caused "materially adverse consequences" that led to "objectively tangible harm." *Douglas*, 559 F.3d at 553. Jones concedes that he *always* took the sick leave, regardless of Burroughs's denials. *Compare* Def.'s SMF ¶ 61–62 (noting that Jones always took his requested sick leave, even when Burroughs did not approve) *with* Pl.'s SMF ¶ 48 ("Though Ms. Burroughs stated that Mr. Jones always took his leave, she did not mention that she took adverse actions against him for taking leave."). So Jones does not, for instance, identify any days he did not take leave when he wanted to, or describe any consequences that flowed from his inability to take leave. And even if Jones *did* fail to take leave on some unidentified occasion, courts have recognized that even the occasional denial of paid leave does not rise to the level of an adverse action. *See Ramsey v. Moniz*, 75 F. Supp. 3d 29, 54 (D.D.C. 2014) (finding that the denial of medical leave on three occasions "was *de minimus* and, consequently, not material"). To be sure, the record reflects other instances where Jones and Burroughs disagreed about whether Jones followed the proper procedures for requesting sick leave. Def.'s SMF ¶ 47; Pl.'s SMF ¶ 46. But such disagreements alone do not amount to adverse employment actions.

Jones also asserts that Burroughs improperly denied—at least at first—his request for compensatory time in August 2012.  But again, he ultimately received all the compensatory time he requested.  Def.'s SMF ¶ 56.  Thus, because Jones has not shown that Burroughs's initial denial of his administrative leave had any material effect, it cannot amount to an adverse employment action that can sustain a discrimination claim.

Jones's other claims that Burroughs purportedly copied Davis on emails containing his personal medical information, and that Burroughs required Jones "to return to the office on November 29, 2012 to enter his time," Opp'n at 37, similarly fall short of qualifying as adverse employment actions.  Jones points to no evidence that any email sent by Burroughs contained confidential information and offers no explanation for how Davis's inclusion on any email caused him harm.  Moreover, even assuming Burroughs demanded that Jones return to enter his time, he cites no harm to the terms and conditions of his employment that he suffered when he did so.

### f.      Letter of Reprimand, Negative Performance Evaluation, and Suspension

Finally, Jones argues that he suffered an adverse employment action when he was issued a letter of reprimand and a negative performance evaluation, and when he was suspended for five days.  Opp'n at 39–40.  Letters of reprimand and performance evaluations do not ordinarily constitute adverse employment actions without a connection to some tangible economic harm or substantive change to employment conditions.  *See Baloch*, 550 F.3d at 1199 ("[P]erformance reviews typically constitute adverse actions only when attached to financial harms."); *Durant v. District of Columbia*, 932 F. Supp. 2d 53, 69 (D.D.C. 2013) ("In this circuit, evaluations and written warnings do not constitute materially adverse actions unless they have tangible adverse consequences."); *Dorns v. Geithner*, 692 F. Supp. 2d 119, 131 (D.D.C. 2010) ("There is a 'thick

body of precedent [that] . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions.'" (quoting *Brown v. Brody*, 199 F.3d 446, 458 (D.C. Cir. 1999))).  And Jones has not shown that he suffered any material harm arising from the reprimand and evaluation.  Rather, he argues that they are adverse actions unto themselves because they put him "in jeopardy of losing his employment."  Opp'n at 39.  Without any further showing, however, they are not actionable adverse employment actions.

Jones also argues that his suspension in January 2013 was an adverse employment action. Opp'n at 39.  Unlike letters of reprimand or performance reviews, courts routinely find that suspensions are adverse employment actions.  *See Dreiband v. Nielsen*, 319 F. Supp. 3d 314, 320 (D.D.C. 2018); *Jones v. Castro*, 168 F. Supp. 3d 169, 183–84 (D.D.C. 2016).  However, Jones failed to mention this suspension in his complaint, so he cannot base his discrimination claim on it now.  *Martin*, 78 F. Supp. 3d at 316 n.55.

Because no adverse employment action underlies Jones's Title VII discrimination, the Court will grant summary judgment for Defendant on Count I.

### 2. Hostile Work Environment

Pointing to many of the same incidents underlying his discrimination claims, Jones also alleges that he was subject to a hostile work environment while employed at VALU.  To prevail on a hostile work environment claim, a plaintiff must show that her workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  In considering a hostile work environment claim, courts look to "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014).  Courts apply an "objective"

standard by considering whether a reasonable person in the plaintiff's position would find the conduct "severely hostile or abusive." *Oncale*, 523 U.S. at 81–82. To be actionable under Title VII, the plaintiff's allegations must be "extreme" and go beyond "the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing." *Faragher*, 524 U.S. at 787–88. And further, courts have determined that the alleged incidents that form the base of a hostile work claim must "give rise to an inference of discrimination." *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003); *see also Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("It is . . . important in hostile work environment claims to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination.").

Of Jones's numerous claims, the incidents upon which he focuses on to support a hostile work environment claim include:

- Muellerweiss's purported remark at the May 4, 2012 farewell ceremony, stating "Oh dag, here comes Orlando. I might as well take me a seat, he's going to be forever." Pl.'s SMF ¶ 14.

- The meeting with Vance where he allegedly made Jones wait for 10 minutes, dismissed a portfolio of his work product, and pointed a finger in Jones's face saying "let me tell you one goddamn thing." *Id.* ¶ 17.

- Remarks attributed to McMahan that Jones was a "smart ass" and "a know it all." *Id.* ¶ 19.

- Davis's purportedly hostile behavior towards Jones during the August 2, 2012 meeting. *Id.* ¶¶ 31–33.

- Several work-related disputes with Burroughs regarding Jones's negative performance review, requests for compensatory time, sick leave, and alleged rudeness to her and other staff members. *Id.* ¶¶ 36–38; 40–42; 45–48; 53–60.

- A dispute with Burroughs over whether Jones improperly took leave. *Id.* ¶¶ 65–72.

Considered together—and along with all the other events in the record that he cites—these incidents do not establish that Jones was subject to a workplace where intimidation, ridicule, and insult was so severe and pervasive as to alter his conditions of employment. Courts in this district regularly reject hostile work environment claims alleging that the plaintiff was subject to similar or harsher treatment. *See, e.g.*, *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6–7 (D.D.C. 2012) (rejecting claim based on a supervisor slamming his hand on a table and throwing a notebook at the employee, issuing negative performance reviews, and isolating employee from her coworkers); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 54–57 (D.D.C. 2004) (rejecting claim based on employee regularly being humiliated publicly, screamed at, and told to "shut up and sit down"). And none of the statements that Jones attributes to his supervisors concern his race or gender or otherwise suggest discriminatory intent. For these reasons, upon consideration of the entire record viewed in the light most favorable to Jones, the Court finds that no reasonable jury could conclude that he was subject to a hostile work environment because of race or gender discrimination.

For all the above reasons, Defendant is entitled to summary judgment on Count I.

### D.      Retaliation (Count IV)

Title VII also protects federal employees from retaliation for asserting their rights under the statute. 42 U.S.C. § 2000e-16(a). "To prove unlawful retaliation, an employee must establish three elements: that she made a charge or opposed a practice made unlawful by Title VII, that the employer took a materially adverse action against her, and that the employer took the action because of her protected conduct." *Allen v. Johnson*, 795 F.3d 34, 38–39 (D.C. Cir. 2015). "[A] plaintiff seeking to defeat summary judgment on her retaliation claim must point to evidence from which a reasonable juror could conclude that the employer took adverse action against her in retaliation for her protected activity." *Id.* at 39.

In the retaliation context, adverse actions "encompass a broader sweep of actions than those in a pure discrimination claim" and "may extend to harms that are not workplace-related or employment-related." *Baloch*, 550 F.3d at 1198 n.4. A materially adverse action for purposes of a retaliation claim is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 54. However, actionable retaliation claims are still "limited to those where an employer causes 'material adversity,' not 'trivial harms.'" *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007) (quoting *Burlington N.*, 548 U.S. at 68). Accordingly, an adverse action in the retaliation context must go beyond "sporadic verbal altercations or disagreements," *Baloch*, 550 F.3d at 1199, and "those petty slights or minor annoyances that often take place at work and that all employees experience," *Burlington N.*, 548 U.S. at 68. "[T]he significance of any given act or retaliation . . . often depend[s] on the particular circumstances." *Id.* at 69.

Jones appears to argue that *all* the purportedly discriminatory actions taken against him were retaliatory. *See* Pl.'s SMF ¶ 14. But many of these events occurred before his first EEO activity on July 25, 2012 and thus cannot form the basis for any retaliation claim. *See McManus v. Kelly*, 246 F. Supp. 3d 103, 115 (D.D.C. 2017). Of the remaining events, none meet the standard for materially adverse actions in retaliation cases.

The comments and hostile treatment by Jones's supervisors that occurred after July 25, 2012, are just the type of sporadic verbal altercations and disagreements that are not materially adverse. *See Baloch*, 550 F.3d at 1199. Likewise, Jones's letter of reprimand and negative performance evaluation, Davis's appointment as Acting Director, and Burroughs's inclusion of Davis on emails related to Jones's sick leave requests are not actionable because Jones fails to show that he suffered some objectively concrete harm as a result. *See Durant v. District of*

*Columbia Government*, 875 F.3d 685, 698 (D.C. Cir. 2017) ("A reprimand letter setting forth allegations of deficient work performance is not a materially adverse action absent a showing that the letter would have dissuaded a reasonable employee from engaging in protected activity."); *see also Baloch*, 550 F.3d at 1199 (holding the same for performance evaluations). Burroughs's denial of Jones's requests for sick leave and compensatory time are also not materially adverse actions because in each case Jones ultimately took the leave and received the benefits he requested. Moreover, in the case of his sick leave, in the one example Jones cites in the record, Burroughs did not prevent Jones from seeking medical care, but merely invited him to take other forms of leave because she believed his sick leave balance had run out. Mot., Ex. 30. These actions do not rise to the level of material adversity. Finally, as discussed above, Jones's claim relating to Burroughs's selection was not exhausted or pled in the complaint, and his claim about his five-day suspension was not pled either. They may not form the basis for a retaliation claim.

Because Jones has not shown that he suffered from any materially adverse action that would dissuade a reasonable worker from making a charge of discrimination, the Court will enter summary judgment for Defendant on his Title VII retaliation claim.

## IV. Conclusion

For all the above reasons, the Court will grant Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 26. The Court will dismiss Counts III and VI and enter judgment for Defendant on Counts I, II, IV, and V. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 25, 2019